UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ADAM MELANSON,

                        Plaintiff,                          **MEMORANDUM OF**
                                                            **DECISION AND ORDER**
        -against-                                           15-cv-4016 (ADS)(GRB)

U.S. FORENSIC, LLC, GARY BELL, HUI ZENG, THE
STANDARD FIRE INSURANCE COMPANY,
NATIONAL FLOOD SERVICE, FOUNTAIN GROUP
ADJUSTERS and JASON SAUVE,

                        Defendants.
------------------------------------------------------------------------x

**APPEARANCES:**

**The Mostyn Law Firm**
*Co-Counsel for the Plaintiff*
3810 W. Alabama Street
Houston, TX 77027
        By:   John S. Mostyn, Esq., Of Counsel

**Denis G. Kelly & Associates, P.C.**
*Co-Counsel for the Plaintiff*
74 West Park Avenue
Long Beach, NY 11561
        By:   Denis G. Kelly, Esq., Of Counsel

**The Demmons Law Firm, LLC**
*Attorneys for Defendants U.S. Forensic, LLC and Gary Bell*
7461 Jade Street
Metairie, LA 70002
        By:   Larry E. Demmons, Esq., Of Counsel

**Milber Makris Plousadis & Seiden, LLP**
*Attorneys for Defendant Hui Zeng*
1000 Woodbury Road, Suite 402
Woodbury, NY 11797
        By:   Thomas M. Fleming, II, Esq., Of Counsel

**Robinson & Cole LLP**
*Attorneys for Defendant Standard Fire Insurance Company*
280 Trumbull Street
Hartford, CT 06103
     By:   Stephen E. Goldman, Esq.
          Wystan M. Ackerman, Esq., Of Counsel

**Foley & Lardner LLP**
*Attorneys for Defendant National Flood Service*
90 Park Avenue
New York, NY 10016
     By:   Anne B. Sekel, Esq., Of Counsel

**Lewis Brisbois Bisgaard & Smith**
*Attorneys for Defendants Fountain Group Adjusters and Jason Sauve*
77 Water Street, 21ˢᵗ Floor
New York, NY 10005
     By:   Seth I. Weinstein, Esq., Of Counsel

**SPATT, District Judge:**

On July 8, 2015, the Plaintiff Adam Melanson ("Melanson" or the "Plaintiff") commenced this action against the Defendants U.S. Forensic, LLC ("US Forensic"), Gary Bell ("Bell"), Hui Zeng ("Zeng"), the Standard Fire Insurance Company ("Standard Insurance"), the National Flood Service ("National Flood"), Fountain Group Adjusters ("Fountain Group"), and Jason Sauve ("Sauve"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and common law breach of contract. In general, the Plaintiff alleges that the Defendants participated in a fraudulent scheme to deny his claim for insurance proceeds arising from property damage he sustained during Superstorm Sandy.

Each of the Defendants has moved to dismiss the complaint.

# I. Background

## A. Overview of the Relevant Statutory Framework

Before delving into the specific facts of this case, the Court finds that it will be helpful to provide an overview of the complex regulatory framework governing federal flood insurance policies.

At the heart of the relevant statutory regime is the National Flood Insurance Act of 1968 ("NFIA" or the "Act"), 42 U.S.C. §§ 4001-4127, which was enacted with a legislative "recogni[tion] that 'many factors have made it uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions,'" Jacobson v. Metro. Prop. & Cas. Ins. Co., 672 F.3d 171, 174 (2d Cir. 2012) (quoting 42 U.S.C. § 4001(b)). Thus, under the Act, "'the federal government provides flood insurance subsidies and local officials are required to adopt and enforce various management measures.'" Id. (quoting Palmieri v. Allstate Ins. Co., 445 F.3d 179, 183 (2d Cir. 2006)).

Within the purview of the Act is a program known as the National Flood Insurance Program ("NFIP" or the "Program"), which is administered by the Federal Emergency Management Agency ("FEMA"), and is "supported by taxpayer funds, which pay for claims that exceed the premiums collected from the insured parties." Jacobson, 672 F.3d at 174 (citing Van Holt v. Liberty Mut. Fire Ins. Co., 163 F.3d 161, 165 n.2 (3d Cir. 1998)). Simply stated, "[t]he NFIP is a federally-subsidized program designed to make flood insurance available to the general public at or below actuarial rates." Moffett v. Computer Scis. Corp., 457 F. Supp. 2d 571, 573 (D. Md. Sept. 29, 2006).

Under the Program, among other things, "FEMA is authorized to promulgate regulations [1] as to 'the general terms and conditions of insurability which shall be applicable to properties eligible for flood insurance coverage,' and [2] as to 'the general method or methods by which proved and approved claims for losses under such policies may be adjusted and paid.' " Id. at 573 (citing Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 599 (4th Cir. 2002)). "In other words, FEMA writes the policies and makes the rules as to claims made under them." Id.

For example, FEMA has established the precise terms and conditions of coverage available under the Program in the form of a so-called Standard Flood Insurance Policy ("SFIP"). See 44 C.F.R. § 61.13 (codifying the terms and conditions of the SFIP); see also Van Holt, 163 F.3d at 165-66 ("FEMA fixes the terms and conditions of the flood insurance policies, which, barring the express written consent of the Federal Insurance Administrator, must be issued without alteration as a Standard Flood Insurance Policy"); Moffett, 457 F. Supp. 2d at 574 (noting that "[t]he terms and conditions of coverage are fixed by FEMA regulation in the form of [an SFIP] and do not vary . . ."); Eodice v. Selective Ins. Co. of Am., No. 08-cv-151, 2010 U.S. Dist. LEXIS 13090, at *2 (D.N.J. Feb. 8, 2010) (same).

"In 1983, FEMA created the Write Your Own ["WYO"] program, which allows private insurance companies to issue and administer SFIPs in their own names as 'fiscal agent[s] of the Federal Government.' " Ravasio v. Fid. Nat'l Prop. & Cas. Ins. Co., 81 F. Supp. 3d 274, 277 (E.D.N.Y. 2015) (Spatt, J.) (quoting 42 U.S.C. § 4071(a)(1)). Under this expansion, private insurance companies are authorized to "write their own" federally-underwritten

SFIPs, <u>Van Holt</u>, 163 F.3d at 165, but in doing so, assume "significant administrative responsibilities under the NFIP," <u>Moffett</u>, 457 F. Supp. 2d at 574.

For example, "[f]or the policies they issue, [WYO companies] are responsible for the adjustment, settlement, payment and defense of all claims." <u>Id.</u>; <u>see</u> 44 C.F.R. §§ 62.21(a), 62.23. "The Government, in return, . . . reimburse[s] the WYO insurer for claims paid under the SFIPs and related litigation costs, and pays the WYO insurer a flat 3.3% commission on claims paid." <u>Eodice</u>, 2010 U.S. Dist. LEXIS 13090, at *2. Thus, under the WYO program, "the private insurance companies administer the federal program," but ultimately, " 'it is the Government, not the companies, that pays the claims.' " <u>Ravasio</u>, 81 F. Supp. 3d at 277 (quoting <u>Jacobson</u>, 672 F.3d at 175); <u>see</u> <u>Gunter v. Farmers Ins. Co.</u>, 736 F.3d 768, 770 (8th Cir. 2013) (noting that "WYO insurers deposit SFIP premiums in the United States Treasury and pay SFIP claims and litigation costs with federal money") (citations omitted).

Relevant here, the NFIA contains a remedial provision, which creates a right of action for insureds against the Federal Insurance Administrator, to be brought in federal court within one year after the cause of action accrues:

> [U]pon the disallowance by the Administrator of any such claim [for losses covered by an SFIP], or upon the refusal of the claimant to accept the amount allowed upon any such claim, the claimant, within one year after the date of mailing of notice of disallowance or partial disallowance by the Administrator, may institute an action against the Administrator on such claim in the United States district court for the district in which the insured property or the major part thereof shall have been situated, and original exclusive jurisdiction is hereby conferred upon such court to hear and determine such action without regard to the amount in controversy.

42 U.S.C. § 4072; <u>see</u> <u>Moffett</u>, 457 F. Supp. 2d at 575 (explaining that "[if] an insured is dissatisfied with the handling of a claim, he or she may . . . bring an action in federal district court") (citing 44 C.F.R., Part 61, App. A(1), Art. VII(P); 42 U.S.C. § 4072).

With this statutory framework in mind, the Court now turns to the relevant facts of this case, which, unless otherwise indicated, are drawn from the complaint and construed in favor of the Plaintiff.

**B.     The Relevant Facts**

The Plaintiff Adam Melanson is an individual who, at all relevant times, owned and derived rental income from a residential property located at 101 Michigan Street in Long Beach (the "Long Beach Residence"). See Compl. ¶ 7.  On an unspecified date, the Plaintiff purchased a policy of flood insurance from the Defendant Standard Insurance (the "Policy").  See id. ¶ 68.  Although the Policy is not attached to the complaint, and few specific facts are alleged as to its contents, it appears that the Policy was a Standard Flood Insurance Policy (previously defined as "SFIP"), issued by Standard Insurance in its capacity as a "Write Your Own" (previously defined as "WYO") company pursuant to the National Flood Insurance Program (previously defined as "NFIP" or the "Program") and its implementing regulations, and contained coverage limits of $250,000.  See, e.g., Compl. ¶¶ 11, 22, 39, 60.

On October 29, 2012, Superstorm Sandy decimated parts of Long Beach and the surrounding areas.  According to the complaint, the Long Beach Residence sustained severe damage.  See id. ¶ 25.  Accordingly, on an unspecified date after the storm, the Plaintiff submitted a claim to Standard Insurance for coverage under the Policy.  See id. ¶ 26.

The complaint alleges that Standard Insurance "contracted with" the Defendant National Flood "to handle the management and adjustment of its Hurricane Sandy claims," id., which, apparently, included the Plaintiff's claim at issue in this case.  Id.  It is further alleged that Standard Insurance, together with National Flood, then retained the Defendant

Fountain Group, a Louisiana-based adjusting firm, and the Defendant Jason Sauve, an individual claims adjuster, to inspect the Long Beach Residence and investigate the claim. See id. ¶¶ 12-13, 26.

After performing an inspection of the Long Beach Residence, during which he allegedly observed substantial damage, Sauve requested that an engineer also inspect the property. See id. ¶ 26.

Thus, according to the complaint, Standard Fire, National Flood, and Fountain Group then retained the Defendant US Forensic, a Louisiana-based engineering firm, to evaluate the Long Beach Residence. See id. ¶¶ 8, 27. Once retained, US Forensic allegedly assigned one of its New York-based engineers, namely, the Defendant Hui Zeng, to assess the property. See id. ¶¶ 9, 27.

On December 2, 2012, Zeng inspected the Long Beach Residence. See id. ¶ 27. On January 18, 2013, she issued a report (the "Damage Report"), which is annexed to the complaint as Exhibit "2." Relevant here, the Damage Report concluded that the Long Beach Residence "was not structurally damaged by hydrodynamic forces, hydrostatic forces, scour or erosion of the supporting soils, or buoyancy forces of the floodwaters associated with" Superstorm Sandy. See Compl. ¶ 27 & Ex. "2" at 1.

Allegedly based on Zeng's findings contained in the Damage Report, Standard Insurance partially denied Melanson's claim for coverage, and reimbursed him with a sum of $65,000. See id. ¶ 28. The Long Beach Residence was eventually condemned by the municipal authorities and demolished. See id. & Ex. "5."

## C.     The Allegations of Fraud

The gravamen of the Plaintiff's complaint is not simply that Standard Insurance and its outside contractors incorrectly assessed the extent of the damage to the Long Beach Residence and underpaid Melanson's claim – it is that the events outlined above typify a larger fraudulent scheme, which was orchestrated by the Defendants to systematically and falsely deny valid insurance claims for their own economic benefit.

In particular, the complaint alleges that, due to its participation as a WYO company in the NFIP, Standard Insurance receives reimbursement from the federal government for coordinating "the adjustment, settlement, payment, and defense of all claims arising under" the SFIPs that it issues, including costs related to claims handling activities and defending related litigation ("Recoverable Costs").  Id. ¶ 11.  Thus, according to the Plaintiff, Standard Insurance is motivated to engage in conduct designed to artificially inflate such costs.  See, e.g., id. ¶¶ 22 (alleging that the government's "methods for reimbursing WYO carriers for the costs associated with administering" claims under the NFIP means that "Standard [Insurance] profits by systematically increasing claim handling expenses"), 33 ("Standard [Insurance] benefits directly from an increase in claims handling and litigation expenses"); 39 & 47 (same).

Further, according to the Plaintiff, the outside contractors that are retained by Standard Insurance to provide adjustment and engineering services – and thereby generate additional Recoverable Costs – are motivated to participate in the scheme by a desire to continue receiving business from Standard Insurance.  See id. ¶¶ 21 (alleging that the Defendants "know that Standard [Insurance] will in turn continue employing [them] and pay them unwarranted consulting fees for their engineering and claims handling work"),

40 ("The more [the Defendants] contribute[ ] to Standard [Insurance]'s inflated expenses, the easier it is for [them] to ensure future assignments and expense payments"), 47 (same).

Applied to the facts of this case, Melanson alleges that when Sauve inspected the Long Beach Property, he observed substantial storm-related damage, but fraudulently neglected to recommend that Standard Insurance pay out the full coverage limits under the Policy. See id. ¶¶ 26, 35. Instead, allegedly in furtherance of the scheme, Sauve requested that an engineer also inspect the property, thereby driving up the Recoverable Costs. See id.

Further, Melanson alleges that when Zeng subsequently inspected the Long Beach Residence, she also observed storm-related damage sufficient to trigger the full limits of the Policy, but falsified the Damage Report to conclude otherwise. See id. ¶ 27. Although it is somewhat unclear how Zeng allegedly "falsified" or "altered" the Damage Report in this case, see, e.g., id. ¶¶ 31 & 41 ("altered"), 36 & 42 ("falsified"), the Plaintiff appears to allege that US Forensic and its engineers have used identical language in as many as 50 similar engineering reports, regardless of the individual circumstances of a given site inspection, which, apparently, have also been used to deny other flood insurance claims made under the NFIP, see id. ¶¶ 27, 29-30. The implication is that the Damages Report in this case was "predetermined"; consisted of mere "boilerplate" language; and did not accurately reflect the extensive damage witnessed by Sauve and Zeng. See id. ¶¶ 27, 29.

Consistent with this allegation, the Plaintiff submits a template that was apparently created by US Forensic for use by its field engineers in preparing reports of their findings. See Compl. Ex. "3". In particular, the template consists of a largely pre-drafted damage report – which is materially indistinguishable from the Damage Report created by Zeng in

this case – with blank spaces for the assigned engineer to insert identifying information relating to a particular inspection, such as "insured name" and "date of flood." See id. Of particular importance, the template contains a fully prepared section entitled "Results and Conclusions," which concludes – as did the Damage Report in this case – that the damage to a potentially covered property was not caused by "the reported flood event of October 29, 2012," namely, Superstorm Sandy. Id.

Further, the Plaintiff attaches more than 100 pages of similar reports created by US Forensics and its engineers in other cases. See id. Ex. "4." In each of the 51 submitted reports, the template was apparently used to reach the identical conclusion, expressed in identical language, as Zeng's conclusion in this case regarding the Long Beach Residence. See id.

Melanson alleges that, in partially denying his claim, Standard Fire and others in the relevant hierarchy remained "willfully blind" to the fabricated Damage Report and the manufacturing of other Recoverable Costs, all in the service of the larger fraudulent scheme. See id. ¶¶ 31, 35-37.

**D.    The Plaintiff's Reliance Upon a Prior Court Order**

In an attempt to bolster the allegations of fraud, the Plaintiff attaches to his complaint a November 7, 2014 Memorandum & Order of United States Magistrate Judge Gary R. Brown, issued in the matter of <u>Raimey v. Wright National Flood Insurance Co.</u>, Case No. 14-cv-461. See Compl. Ex. "9".

That case also involved allegations by Long Beach residents – Melanson's neighbors, in fact – that their claim for insurance coverage after Hurricane Sandy had been wrongfully denied. According to Judge Brown's opinion, the plaintiffs in <u>Raimey</u> claimed to possess

evidence that the engineering report, which had been prepared by US Forensic, and which was ultimately relied upon by the insurance company to deny the plaintiffs coverage under an SFIP, had actually been doctored in order to reach a false conclusion about the cause of their property damage. Judge Brown conducted an evidentiary hearing with regard to these allegations.

Relevant here, the evidence adduced at the hearing revealed "a process by which the report authored by the inspecting engineer was *rewritten* by an engineer who had not inspected the property and whose identity remained concealed from the homeowner, the insurer and, ultimately, the Court." See id. at 9 (emphasis in original). More specifically, Judge Brown wrote that:

> U.S. Forensic, an engineering firm retained by defendant Wright National Flood Insurance Company ("Wright") to examine a storm-battered house in Long Beach, New York, unfairly thwarted reasoned consideration of plaintiffs' claims through the issuance of a baseless report. The engineer sent by U.S. Forensic opined in a written report that the home at issue had been damaged beyond repair by Hurricane Sandy. A second engineer, who did little more than review the photographs taken by the inspecting engineer, secretly rewrote the report, reversing its conclusion to indicate that the house had not been damaged by the storm, and attributing – without sufficient evidence – defects in the home to long-term deterioration.

Id. at 2-3.

The complaint in this action makes numerous references to the findings contained in Judge Brown's opinion in Raimey. See, e.g., Compl. ¶¶ 18, 20, 32. Apparently, in doing so, Melanson seeks to draw the inference that, because US Forensic was previously found to have tampered with some engineering reports relating to property damaged by Superstorm Sandy, the engineering report relating to the Long Beach Residence in this case, namely, the Damages Report prepared by Zeng, is similarly fabricated. In regard to the RICO claim, Melanson appears to suggest that Judge Brown's findings in Raimey

support the conclusion in this case that the Defendants are engaged in a widespread fraudulent scheme, of which he fell victim.

**E.      Relevant Procedural History and Summary of the Arguments**

On these facts, the Plaintiff asserts causes of action based on violations of the RICO statute, <u>see id.</u> ¶¶ 63-66, and common law breach of contract, <u>see id.</u> ¶¶ 67-73.  He seeks to recover a sum of $180,000 allegedly due under the Policy, plus lost rental income and other out-of-pocket expenses, in an unspecified amount, which he claims to have incurred as a proximate result of the denial of insurance proceeds.  <u>See id.</u> ¶ 74.  Finally, he seeks treble damages, costs, attorneys' fees, and interest, as provided for in the RICO statute.  <u>See id.</u>

Between November 5, 2015 and December 7, 2015, each of the Defendants filed a motion to dismiss the complaint, raising one or more of the following arguments:

(1)      US Forensic, Bell, Zeng, Standard Insurance, and National Flood contend that the RICO claim is preempted by the NFIP, which provides the exclusive remedy for disputes arising out of the handling of claims under SFIPs;

(2)      US Forensic, Bell, Zeng, Fountain Group, and Sauve contend that Melanson lacks standing to maintain a RICO claim;

(3)      US Forensic, Bell, Standard Insurance, Fountain Group, Sauve, and National Flood contend that principles of sovereign immunity preclude RICO liability against them because, as participants in the NFIP, they acted at all relevant times as fiscal agents of FEMA, which is exempt from RICO;

(4)      All of the Defendants contend that the complaint fails to state enough specific facts to pass muster under the heightened pleading standard found in Fed. R. Civ. P. 9(b), or to otherwise make it plausible that they are liable for RICO violations; and

(5)      Standard Insurance contends that the Plaintiff's breach of contract claim is time-barred.

The Court will review the applicable legal standards and then proceed to address the merits of these contentions, so as to resolve the motions to dismiss.

## II.     Discussion

### A.     The Standard of Review

Each of the Defendants moves under Fed. R. Civ. P. 12(b)(6), contending that, for the reasons outlined above, the allegations in the complaint fail to state a claim upon which relief may be granted.

Under Fed. R. Civ. P. 8(a)(2), a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."   The pleading standard announced in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 677-78 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " Id. at 678  (quoting Twombly, 550 U.S. at 555).

Rather, to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " Id. (quoting Twombly, 550 U.S. at 557).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 557.

Furthermore, claims based on fraud are subject to the heightened pleading standard found in Fed. R. Civ. P. 9(b).   In particular, a party asserting fraud "must state with particularity the circumstances constituting fraud or mistake."   Fed. R. Civ. P. 9(b).  "Rule 9(b) is satisfied when the complaint specifies 'the time, place, speaker, and content of the alleged misrepresentations;' how the misrepresentations were fraudulent; and the details that 'give rise to a strong inference that the defendant[ ] had an intent to defraud,

knowledge of the falsity, or a reckless disregard for the truth.'" <u>Schwartzco Enters. LLC v.</u> <u>TMH Mgmt., LLC</u>, 60 F. Supp. 3d 331, 344 (E.D.N.Y. 2014) (Spatt, J.) (quoting <u>Cohen v. S.A.C.</u> <u>Trading Corp.</u>, 711 F.3d 353, 359 (2d Cir. 2013)).

The Court notes that the Plaintiff failed to respond in any manner to the motion to dismiss filed by National Flood. In this regard, although National Flood urges the Court to grant its motion as unopposed, "the failure to oppose a 12(b)(6) motion does not justify dismissal of a complaint." <u>JCG v. Ercole</u>, No. 11-cv-6844, 2014 U.S. Dist. LEXIS 57417, at *21 (S.D.N.Y. Apr. 24, 2014) (Report and Recommendation), <u>adopted</u>, 2014 U.S. Dist. LEXIS 83800 (S.D.N.Y. June 18, 2014) (citing <u>Goldberg v. Danaher</u>, 599 F.3d 181, 183-84 (2d Cir. 2010); <u>McCall v. Pataki</u>, 232 F.3d 321, 322-23 (2d Cir. 2000)). Rather, "[a]s with all 12(b)(6) motions, in deciding an unopposed motion to dismiss, the court is to 'assume the truth of a pleading's factual allegations and test only its legal sufficiency' according to the principles ordinarily applicable on a motion to dismiss.'" <u>Id.</u> (quoting <u>Johnson v. Agros</u>, No. 10-cv-8312, 2012 U.S. Dist. LEXIS 117248, at *6-*7 (S.D.N.Y. Aug. 20, 2012)); <u>see also</u> <u>Straw v. Colvin</u>, No. 13-cv-2470, 2016 U.S. Dist. LEXIS 23962, at *7 (S.D.N.Y. Feb. 26, 2016); <u>Nardiello v. Maureen's Kitchen, Inc.</u>, No. 14-cv-4070, 2015 U.S. Dist. LEXIS 32574, at *4 n.3 (E.D.N.Y. Mar. 17, 2015).

**B.      As to Whether the Plaintiff's RICO Claim is Preempted by the Provisions of the National Flood Insurance Program and its Implementing Regulations**

### 1.      The Applicable Legal Principles

As noted above, several of the Defendants contend that the Plaintiff's RICO claim must fail, as a matter of law, because it is preempted by the provisions of the NFIP, which, by its terms, exclusively governs all disputes arising out of the adjustment and handling of claims made under SFIPs. This argument will be discussed in greater detail below.

### a. The Relevant Statutory Language

Congress gave FEMA broad authority under the NFIP to establish the precise terms and conditions of insurability under the SFIP, and to regulate the methods by which flood loss claims are adjusted, approved, and paid. See <u>Davis v. Travelers Prop. & Cas. Co.</u>, No. C 99-02025, 2000 U.S. Dist. LEXIS 11034, at *20 (N.D. Ca. Apr. 19, 2000) (quoting 42 U.S.C. §§ 4013, 4019). In this regard, a section of the SFIP entitled "What Law Governs" – which, for purposes of this opinion, the Court will refer to as "Article IX" – provides specifically that "[t]his policy and <u>all disputes arising from the handling of any claim under the policy</u> are governed <u>exclusively</u> by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended, and Federal common law." 44 C.F.R. Part 61, Appendix (A)(1) at Art. IX (underscore supplied); <u>see</u> 44 C.F.R. § 61.13(a) (incorporating Appendix "A" into the SFIP).

"The underlined language amended an earlier version of the provision; it was added to ensure uniform interpretation of [the] SFIP and to clarify that 'matters pertaining to the [SFIP], including issues relating to and arising out of claims handling, must be heard in Federal court and are governed exclusively by Federal law.' " <u>Gunter</u>, 736 F.3d at 772 (quoting 65 Fed. Reg. 34,824, 34,826-27 (May 31, 2000)).

In this case, the Defendants rely upon Article IX to support their contention that the NFIP is intended to provide the exclusive remedy for claims handling disputes under the Program, to the exclusion of all other laws, including RICO.

### b. The Preemptive Effect of the NFIP

At the outset, the Court notes that, apparently, this case presents an issue of first impression. The parties have not cited any cases – nor has the Court's independent

research revealed any – in which the preemptive effect of the NFIP has been considered in relation to a civil RICO claim based on alleged misconduct in the claims handling process under a federal flood insurance policy.

In fact, it appears that no reported case addresses whether the provisions of the NFIP preempt *any* federal statute. On the contrary, the body of relevant caselaw deals exclusively with the preemptive effect of the NFIP on claims based on theories of state tort liability and federal common law. Nonetheless, the Court notes that every circuit to address that question has concluded that the NFIA neither creates nor authorizes an extra-contractual right of action for insureds who are dissatisfied with the handling of a claim under the Program. Rather, these same courts have consistently found that Congress intended for the NFIP to preclude such claims when the underlying facts arise from a WYO carrier's administration of the Program.

For example, in <u>Gibson v. American Bankers Insurance Co.</u>, 289 F.3d 943 (6th Cir. 2002), the plaintiffs had purchased federal flood insurance from the defendant pursuant to the WYO program. After the plaintiffs' home was damaged in a flood, they made a claim under their SFIP but were denied coverage. So, they commenced an action alleging breach of contract, breach of fiduciary duty, and other related claims under Kentucky state law. Relevant here, the court noted that the Sixth Circuit had not previously considered this question, but nevertheless observed that "most courts ha[d] consistently found that NFIA preempts state law claims that are based on the handling and disposition of SFIP claims." <u>Id.</u>, 289 F.3d at 949 (collecting cases). Thus, to the extent that the plaintiffs' claims involved the defendant's alleged "fail[ure] to act promptly on communications, refus[al] to pay the claim, fail[ure] to affirm coverage, and not attempting a good faith settlement," they were

"all based on defendant's handling and denial of coverage under the SFIP," which fell within the purview of the NFIP.  Id.  In this regard, the court noted that "Congress and FEMA have regulated the claims adjustment process and judicial review of coverage claims under flood insurance policies.  Uniformity of decision requires the application of federal law and precludes the enforcement of state laws on the same subject."  Id.

In reaching this conclusion, the court in Gibson emphasized the role of the public fisc in determining which categories of claims are appropriate to allow against WYO carriers.  In this regard, cognizant that these carriers act as fiscal agents of the government under the Program, the court observed that if the plaintiffs were to prevail, their coverage claims and associated defense costs would be paid with federal funds – a factor which militated against allowing such claims to proceed.  See id.

Subsequently, in C.E.R. 1988, Inc. v. Aetna Casualty and Surety Co., 386 F.3d 263, 265 (3d Cir. 2004), the Third Circuit also considered "whether the [NFIP] is sufficiently comprehensive to preempt a state tort suit arising from conduct related to the Program's administration."  In that case, a hurricane damaged the plaintiff's property, which was covered by a WYO-issued federal flood insurance policy.  When a dispute arose over the defendant's partial denial of coverage, the plaintiff filed a complaint alleging, among other things, negligence and tortious bad faith in the adjustment process, as well as claims for punitive damages, attorneys' fees, and costs.

Relevant here, in addressing the preemption issue, the court centered its decision on Congress's intent in enacting the Program and vesting the federal courts with exclusive original jurisdiction over related disputes.  In particular, drawing on its prior decision in

<u>Van Holt v. Liberty Mutual Fire Insurance Co.</u>, 163 F.3d 161 (3d Cir. 1998), the court in

<u>C.E.R.</u> stated that:

> The uniformity touted in that decision would be seriously jeopardized if state
> tort claims were permitted to proceed, even if those claims were resolved in
> federal court. We reasoned [in <u>Van Holt</u>] that "Congress would want federal
> courts to adjudicate disputes over federal flood insurance policies for which
> the federal government would be responsible." <u>Van Holt</u>, 163 F.3d at 167. By
> the same token, Congress would want federal law to govern those disputes.
> And what Congress intends is the crux of our preemption analysis.

<u>C.E.R.</u>, 386 F.3d at 268.

Thus, the court noted that "[s]tate tort suits against WYO companies, which are

usually expensive, would undermine th[e] goal" of "reduc[ing] the fiscal pressure on federal

flood relief efforts," which is "[i]ndisputably a central purpose of the Program." <u>Id.</u> at 270.

In this regard, the court again emphasized the financial strain that would be placed on the

public fisc if insureds were authorized to pursue state tort remedies for conduct that fell

within the scope of the Program. In particular, since "it appears that FEMA ordinarily will

be responsible financially for the costs of defending a lawsuit against a WYO

company[,] . . . [t]he efficiency goals of the Program[ ] would better be served by requiring

claimants to resolve their disputes by means of the remedies FEMA provides." <u>Id.</u> at 271.

The alternatives, explained the court, were worse:

> If FEMA refused to reimburse WYO carriers for their defense costs, insurers
> would leave the Program, driving the price of insurance higher. The
> alternative, remuneration for losses incurred in such suits, would directly
> burden the federal Treasury.

<u>Id.</u> at 270.

Thus, similar to the <u>Gibson</u> court, the court in <u>C.E.R.</u> concluded that the plaintiff's

state tort claims were "incompatible with the objectives of the NFIA and therefore [we]re

preempted." <u>Id.</u> at 272.

In <u>Wright v. Allstate Insurance Co.</u>, 415 F.3d 384 (5th Cir. 2005) ("<u>Wright I</u>"), the plaintiff made a claim under an SFIP for damages sustained to his home during a tropical storm. When attempts to settle his claim with the issuing WYO carrier were unsuccessful, the plaintiff commenced an action alleging numerous state law contract and tort theories, including breach of contract, violations of the Texas Insurance Code and Deceptive Practices Act, breach of the common law duty of good faith and fair dealing, fraud, and negligent misrepresentation. The district court dismissed all but the breach of contract claim, finding the others to be preempted by federal law.

On appeal, the Fifth Circuit expressly adopted the approach of its sister circuits in <u>Gibson</u> and <u>C.E.R.</u> "in holding that state law tort claims arising from claims handling by a WYO are preempted by federal law." <u>Id.</u> at 390. Such a conclusion, reasoned the court, was consistent with its earlier observation in the case of <u>West v. Harris</u>, 573 F.2d 873, 881 (5th Cir. 1978), that the NFIP is "a child of Congress, conceived to achieve policies which are national in scope," and in which "the federal government participates extensively . . . both in a supervisory capacity and financially."

Further, the court took special note of the statutory language which is at issue in this case, namely, Article IX, and noted that, although "no circuit ha[d] yet addressed whether this amendment is effective as an express preemption of state law claims, it can obviously be so argued." <u>Id.</u> at 390 (citations omitted). Thus, the court in <u>Wright I</u> affirmed the portion of the lower court's decision which found that the plaintiff's state law claims based on, among other things, fraud and negligent misrepresentation, were preempted by the Program, and remanded the matter to the district court on separate grounds.

Later, the <u>Wright</u> case was back before the Fifth Circuit after the district court, on remand, refused to allow the plaintiff to amend his complaint to assert "federal common law causes of action for fraud and negligent misrepresentation." <u>Wright v. Allstate Ins. Co.</u>, 500 F.3d 390, 392 (5th Cir. 2007) ("<u>Wright II</u>"). The plaintiff argued that, to the extent Article IX "specifies that disputes arising from the handling of an insurance claim shall be governed by federal common law," the Program expressly or impliedly provides for such claims. <u>See</u> <u>id.</u> at 393. The court disagreed, holding that:

> Even though the NFIA does allow a policyholder to sue a WYO insurer for amounts due under the contract, nowhere in the NFIA or the SFIP does Congress explicitly reference any right of a policyholder to bring extra-contractual claims against a WYO insurer.
>
> *            *            *
>
> [T]he reference to federal common law in [Article IX of] the SFIP directs courts to employ standard insurance principles when deciding *coverage* issues under the policy. It does not confer on policyholders the right to assert extra-contractual claims against WYO insurers – which claims, if successful, would likely be paid with government funds.

<u>Id.</u> at 394 (emphasis in original).

Thus, the court held plainly "that neither the NFIA nor the SFIP expressly authorizes policyholders to file extra-contractual claims against a WYO insurer." <u>Id.</u> On the contrary, in determining that the Program also does not impliedly authorize the right of action sought to be asserted by the plaintiff, the court noted that "there is no indication in the legislative history or elsewhere that Congress intended to create or permit additional causes of action" other than those deliberately written into the statute. *Id.* at 397 ("We deem it significant that Congress expressly provided a private remedy for policyholders in 42 U.S.C. §§ 4053 and 4072").

In dicta, the court further noted that permitting dissatisfied insureds to bring extra-contractual claims against WYO carriers would run counter to the policy rationale undergirding the Program insofar as it would "increase rather than confine the burdens on the federal government and the federal fisc that the NFIA was created to mitigate." Id.

More recently, in Gunter v. Farmers Insurance Co., 736 F.3d 768 (8th Cir. 2013), the Eighth Circuit held that the plaintiffs could not maintain state tort claims against their WYO carrier under theories of specific performance, unjust enrichment, and insurance bad faith, as those claims were preempted by the provisions of the NFIP. See id. at 771. In this regard, the court relied upon the Eleventh Circuit's decision in Shuford v. Fidelity National Property and Casualty Insurance Co., 508 F.3d 1337 (11th Cir. 2007), in holding that "the plain language of [Article IX], as well as FEMA's stated purpose in amending it, reflects a clear intent to preempt claims under state law" "that arise from the handling of a claim under the SFIP." Id. at 772.

Nor could the plaintiffs proceed with extra-contractual claims allegedly grounded in the federal common law. Relying on the Fifth Circuit's decision in Wright I, the court held that:

> The NFIP specifically allows a policyholder to sue a WYO insurer for breach of contract, 42 U.S.C. §§ 4053, 4072, but it does not contemplate extracontractual claims such as negligence or actions for a declaratory judgment. The reference to "federal common law" in the SFIP has been understood to direct courts to look to "standard principles of interpreting insurance contracts when resolving questions" about coverage, *not to expand available remedies or causes of action*. Wright, 500 F.3d at 397; see also Scritchfield [v. Mut. of Omaha Ins. Co.], 341 F. Supp. 2d [675,] 681-82 [E.D. Tex. 2004].

Gunter, 736 F.3d at 773 (emphasis supplied).

In sum, the Gunter court affirmed the dismissal of the plaintiffs' "tort and extra-contractual claims under federal common law," as those claims essentially sought "to obtain state law remedies otherwise preempted" and would, if allowed, impermissibly "frustrate the intent of Congress" in enacting the Program.  See id.

Guided by these authorities, district courts in this Circuit – including, recently, this Court – have similarly held that claims by insureds, other than for breach of contract, which arise from conduct falling within the scope of the NFIP, are preempted.  See, e.g., Ravasio v. Fid. Nat'l Prop. & Cas. Ins. Co., 81 F. Supp. 3d 274, 280 (E.D.N.Y. 2015) (Spatt, J.) (expressly rejecting the plaintiffs "extra-contractual requests for interest, costs, and attorneys' fees" because the NFIP "preempts state law claims for penalties and attorneys' fees brought against WYO insurance carriers participating in the" Program); see also Wing Bldg. Holding Co. LLC v. Std. Fire Ins. Co., No. 1:13-cv-1007, 2015 U.S. Dist. LEXIS 17761, at *10 (N.D.N.Y. Feb. 13, 2015) (rejecting proposed claims based on fraud and unfair claims settlement practices because, under Article IX, "the SFIP preempts all state-law claims"); Southbridge 21 LLC v. Std Fire Ins. Co., No. 3:14-cv-374, 2014 U.S. Dist. LEXIS 128960, at *6-*12 (N.D.N.Y. Sept. 16, 2014) (dismissing claim based on an insurer's alleged "willful and negligent refusal to bargain in good faith"; noting that "[a]lthough the Second Circuit has not spoken on this issue," the weight of authority from other circuits holds that "absent authorization by the NFIA and/or the SFIP, an insured may not assert extra-contractual claims against a WYO company").

The Court notes that the Plaintiff attempts to portray the relevant legal landscape as being divided on this question.  In this regard, he relies only upon a 2014 district court decision from the District of Connecticut, which allowed an insured's claims sounding in

negligent misrepresentation, breach of implied covenant of good faith and fair dealing, and violations of Connecticut's unfair trade practices statutes, to proceed against a WYO carrier. See Ragusa Corp. v. Std. Fire Ins. Co., No. 3:12-cv-1609, 2014 U.S. Dist. LEXIS 40812, at *8-*11 (D. Conn. Mar. 27, 2014). However, this decision has been recognized as "an outlier" relative to the existing body of relevant caselaw, see Southbridge 21 LLC, 2014 U.S. Dist. LEXIS 128960, at *10, and has not been cited as authoritative by any other court.

### c. The Preemptive Effect of Complex Statutory Schemes

Although similar, the legal authority outlined above does not deal directly with the question presented in this case – namely, whether the provisions of the NFIP preempt claims based on violations of other federal statutes, including RICO, for conduct that falls within its scope. The Defendants argue that it is logical to extend the holdings and reasoning of those cases – which, in this Court's view, represent a clear majority of federal appellate authority – in order to conclude that the Plaintiff's RICO claim in this case is precluded. In further support of this theory, the Defendants rely on a line of cases holding that, generally, a precisely-drawn, detailed statute will preempt more general remedies. See, e.g., Hinck v. United States, 550 U.S. 501, 506 127 S. Ct. 2011, 167 L. Ed. 2d 888 (2007); Brown v. GSA, 425 U.S. 820, 835, 96 S. Ct. 1961, 48 L. Ed. 2d 402 (1976). From this premise, the Defendants argue persuasively that the complex regulatory scheme set forth in the NFIP is not only intended to preempt state law remedies, but also to provide the exclusive federal remedy for conduct falling within the Program's scope.

For example, in Norman v. Niagara Mohawk Power Corp., 873 F.2d 634 (2d Cir. 1989), the Second Circuit considered whether an employee of a nuclear power plant could maintain a RICO claim based on alleged misconduct by his employer. The court held that

he could not, given the clear Congressional intent that the federal Energy Reorganization Act of 1974 ("ERA") and its implementing regulations provide the exclusive remedy for employee grievances of the type asserted by the plaintiff.  In reaching this conclusion, the court noted that "[a]rtful invocation" of the "ubiquitous" and "controversial" civil RICO statute "[could not] conceal the reality that the gravamen of the complaint" was an employment grievance falling squarely within the scope of the ERA.  Id. at 637-38.

More recently, in DeSilva v. North Shore LIJ Health Systems ,Inc., 770 F. Supp. 2d 497 (E.D.N.Y. 2011), an overtime wage class action, the plaintiffs sued their employers under the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), the Employee Retirement Income Security Act ("ERISA"), and RICO, in addition to numerous state common law theories, including, among others, breach of contract, fraud, and negligent misrepresentation.  The district court (Bianco, J.) relied on Brown v. GSA, supra, "in which the [Supreme] Court held that the 'careful blend of administrative and judicial enforcement powers' set forth in Section 717 of the Civil Rights Act of 1964 led 'unerringly to the conclusion that [Section 717] . . . provides the exclusive judicial remedy for claims' falling within its scope." Id. at 512 (quoting Brown, 425 U.S. at 833-35).  Applying this reasoning, the court found the plaintiffs' RICO claim to be preempted by the "similarly detailed statutory scheme" for addressing overtime violations set forth in the FLSA.  See id. at 513. In particular, owing in part to its own "careful blend of administrative and judicial enforcement powers," the Court held that, the FLSA "provides the exclusive remedy for wage and hour violations that fall within the FLSA's scope." Id.

Just last month, a district court in the Southern District of New York considered whether a fashion model could maintain claims against her modeling agency under the

FLSA, the Immigration and Nationality Act ("INA"), and RICO, arising from the employer's allegedly illegal labor practices. See Palmer v. Trump Model Mgmt., LLC, No. 14-cv-8307, 2016 U.S. Dist. LEXIS 51061 (S.D.N.Y. Mar. 23, 2016). The court dismissed the RICO claim under Rule 12(b)(6), finding that the plaintiff's claims were governed exclusively by the provisions of the INA for redressing alleged labor violations. See id. at *12 (finding that "[t]he RICO statute . . . is not the proper avenue for relief" because the INA "set forth the specific administrative remedies available " to her, which "indicate[s] Congress' clear intent to limit enforcement of alleged violations to administrative mechanisms before resort can be had to a court action"). In particular, relying on Hinck, Brown, and their progeny, the court stated that "[c]ourts in this Circuit have routinely precluded RICO claims where the alleged conduct is already covered by a more detailed federal statute." Id. at *12-*13 & n.14 (collecting cases).

The Plaintiff's reliance on cases suggesting that "one federal statute cannot preempt another," see, e.g., Proctor v. UPS, 502 F.3d 1200, 1205 n.2 (10th Cir. 2007) and Baker v. IBP, Inc., 357 F.3d 685, 687-88 (7th Cir. 2004), is misplaced. It is true that principles of federal preemption traditionally apply where, by operation of the Supremacy Clause, federal laws render overlapping state laws ineffectual. However, as the authorities outlined above make clear, the legal concept of preemption is also routinely used to analyze situations where a comprehensive statutory and regulatory scheme provides the exclusive federal remedial mechanism for a class of potential claims. In this way, modern principles of "preemption" may appropriately apply in the context of coordinate federate statutes. The Court declines the Plaintiff's invitation to rely strictly on the terminology used by the

Defendants in framing their argument – even if it is perhaps not literally or historically apt – as the legal basis for the relief they seek is obvious.

2.     **Application to the Facts of this Case**

Applying these standards, the Court is persuaded that the Plaintiff's RICO claim is precluded by the provisions of the NFIP, which provides the exclusive remedy for all claims arising from a WYO carrier's handling of claims under an SFIP.

Initially, there is no question that the allegations giving rise to Melanson's complaint relate directly to the adjustment, processing, and payment of his flood loss claim under the Policy.   Indeed, as outlined above, he alleges that Standard Insurance and its outside contractors schemed to deliberately misevaluate the extent of the storm damage sustained by the Long Beach Residence; artificially inflate the associated Recoverable Costs under the Program; and ultimately underpay his claim for coverage.   To the extent that these allegations are, at bottom, fundamentally related to the handling of his claim under the SFIP, they fall comfortably within the purview of Article IX, which designates the remedial mechanisms in the NFIP as the exclusive method of redress.  See Moffett, 457 F. Supp. 2d at 580 ("[W]hat is apparent is that the challenged conduct centers around the adjustment of the insured Plaintiffs' flood loss claims.  In other words, the thrust of both Counts III and IV is that they relate to *the handling of claims under the SFIP*") (emphasis in original) (internal quotation marks omitted).

That being said, in the Court's view, there is little room for disagreement on the law. As discussed above, every circuit to have considered this question has come down on the side of the Defendants in this case.   Although the leading cases deal only with the preemptive effect of the NFIP on overlapping claims based on state and federal common

law theories, the Court discerns no principled basis – and the Plaintiff has not provided any – for refusing to extend those holdings and their underlying rationale to the facts of this case. Several relevant factors highlighted in the caselaw support this conclusion.

First, several courts have emphasized the need for uniformity of decision in cases arising out of the handling of claims under the Program. See DeCosta v. Allstate Ins. Co., 730 F.3d 76, 84 (1st Cir. 2013) (noting that "[t]he need for uniformity in federal law also supports strict construction of the SFIP" and that "[s]uch uniformity provides clarity to the numerous insurance companies issuing the bulk of insurance policies under the NFIP, as well as the diverse jurisdictions inundated with flood insurance claims after these disasters"); see also Jacobson, 672 F.3d at 175; C.E.R., 386 F.3d at 269; Gibson, 289 F.3d at 949; Flick v. Liberty Mut. Fire Ins. Co., 2045 F.3d 386, 930 (9th Cir. 2000) ("There is a compelling interest in assuring uniformity of decision in cases involving the NFIP") (citation omitted), cert. denied, 531 U.S. 927, 121 S. Ct. 305, 148 L. Ed. 2d 245 (2000); West, 573 F.2d at 881.

In the Court's view, it would be patently inconsistent with the federal government's overarching goal of promoting uniformity to disallow a wide range of tort and federal common law claims arising out of claims handling activities by WYO carriers, only to permit a civil RICO claim to proceed on the same underlying facts. If uniformity of decision is truly to be achieved under the NFIP, Article IX must be recognized as limiting the remedies available to policyholders to those expressly set forth in the Act. See C.E.R., 386 F.3d at 271 ("The efficiency goals of the Program[ ] would better be served by requiring claimants to resolve their disputes by means of the remedies FEMA provides").

Second, courts have repeatedly emphasized the harmful effect that duplicative flood loss claims would have on the public fisc. Indeed, as the Court in <u>C.E.R.</u> noted, "[s]tate tort suits against WYO companies, which are usually expensive, would undermine th[e] goal" of "reduc[ing] the fiscal pressure on federal flood relief efforts," which is "[i]ndisputably a central purpose of the Program." <u>Id.</u> at 270. In the Court's view, there is no logical basis for concluding that this concern is unique to state tort suits. In fact, the prospect of dissatisfied insureds pursuing civil RICO actions against WYO companies and their outside contractors, in which treble damages and other statutory forms of relief are authorized, would, in the Court's view, pose an equal, if not greater financial risk. This conclusion is supported by the Fifth Circuit's observation in <u>Wright II</u> that "[s]ubjecting the government to extra-contractual claims on flood insurance policies would increase rather than confine the burdens on the federal government and the federal fisc that the NFIA was created to mitigate." 500 F.3d at 397. Although stated in dicta, this admonition is not limited in scope to state tort claims – rather, it recognizes that *any* extra-contractual claims on flood insurance policies would burden the system.

This point leads to the third relevant factor in the Court's analysis, namely, that courts to consider this issue have consistently implied that the preemptive effect of the NFIP is not limited to state law claims. In this regard, the Court is persuaded by the Fifth Circuit's preemption analysis in <u>Wright II</u>, in which it found that "nowhere in the NFIA or the SFIP does Congress explicitly reference any right of a policyholder to bring extra-contractual claims against a WYO insurer" and that the reference to federal common law in Article IX "does not confer on policyholders the right to assert extra-contractual claims

against WYO insurers – which claims, if successful, would likely be paid with government funds." Id. at 394.

In the Court's view, the use of the term "extra-contractual" in Wright and other subsequent cases, see, e.g., Gunter, 736 F.3d at 773, Ravasio, 81 F. Supp. 3d at 280, is reasonably interpreted as referring to any claim – whether grounded in state or federal law, statute or common law – other than one based on breach of contract, which Congress saw fit to explicitly provide in the Act, see Gunter, 736 F.3d at 773 (recognizing that "[t]he NFIP specifically allows a policyholder to sue a WYO insurer for breach of contract"); Wright II, 500 F.3d at 394 (noting that the "NFIA does allow a policyholder to sue a WYO insurer for amounts due under the contract").  Again, this view is buttressed by the court's reasoning in Wright II, namely, its inability to identify any basis "in the legislative history [of the Act] or elsewhere that Congress intended to create or permit *additional causes of action*" other than those deliberately written into the statute.  500 F.3d at 397 ("We deem it significant that Congress expressly provided a private remedy for policyholders in 42 U.S.C. §§ 4053 and 4072").

Finally, the Court is persuaded by the line of cases, exemplified by the Second Circuit's opinion in Norman, which hold that civil RICO claims are precluded where the challenged conduct is already covered by a more comprehensive and specialized federal statute.  See Palmer, 2016 U.S. Dist. LEXIS 51061, at n.14 (observing that courts in the Second Circuit "routinely preclude[ ] RICO claims where the alleged conduct is already covered by a more detailed federal statute").  This rule has direct application in the context of the NFIP because "Congress and FEMA have regulated the claims adjustment process and judicial review of coverage claims under flood insurance policies." Gibson, 289 F.3d at

949. Thus, all material aspects of the flood insurance industry – from the unalterable terms and conditions of flood loss policies, to the structure of a reimbursement system "devised to minimize the risk that the carriers might be inclined to undervalue claims," Moffett, 457 F. Supp. 2d at 574, to the timing and manner in which an aggrieved policyholder may seek redress – are scrupulously prescribed in the statute.

Under the relevant caselaw, this "careful blend of administrative and judicial enforcement powers" would ordinarily be sufficient to confer upon the NFIP primacy over other forms of relief with respect to claims handling disputes. See DeSilva, 770 F. Supp. 2d at 512. However, Congress saw fit to go a step further and amend the Act in order to make more explicit in the text of Article IX that "all disputes arising from the handling of any claim under [an SFIP] are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended, and Federal common law." In the Court's view, this reflects a clear legislative intent to limit the available remedies to policyholders for claims under the Program, and the Plaintiff's "[a]rtful invocation" of the "ubiquitous" and "controversial" civil RICO statute "cannot conceal the reality that the gravamen of the complaint" is a claims handling dispute falling squarely within the scope of the NFIP. Norman, 873 F.2d at 637-38.

For these reasons, the Court finds that "[t]he RICO statute . . . is not the proper avenue for relief." Palmer, 2016 U.S. Dist. LEXIS 51061, at *12. In reaching this conclusion, the Court rejects the Plaintiff's argument that the allegations giving rise to his RICO claim do not actually fall within the purview of the NFIA – and are therefore not preempted – because, to the extent they allege criminal conduct, they are outside the scope of the WYO carrier's agreement with FEMA.

In support of this argument, Melanson relies on a FEMA regulation titled "Loss Payments," which provides, in relevant part, that the federal government will not defend or indemnify WYO insurers for litigation expenses if "the litigation is grounded in actions by the [WYO] Company that are significantly outside the scope of th[e] [NFIP] Arrangement, and/or involves issues of agent negligence." 44 C.F.R., Part 62, App. A(1), Art. III(D)(3)(a). According to the Plaintiff, this provision of the NFIP – which apparently contemplates a WYO carrier incurring litigation costs that are not reimbursable because they arise from conduct, such as negligence, which is outside the scope of the Program – "would be superfluous if lawsuits arising from those actions were barred." The Court disagrees.

Contrary to the Plaintiff's interpretation, the "Loss Payments" regulation is simply a cost-shifting provision, which authorizes FEMA, under narrow circumstances, and in its sole discretion, to shift the cost of defending an action under the Program from the government to the private carrier. There is no reasoned basis for concluding that this regulation overrides or circumscribes the express limitation of liability contained in Article IX, or otherwise expands the substantive remedies available to policyholders beyond the contractual remedy prescribed in the Act.

Under the Plaintiff's theory, any time a policyholder unilaterally accused a WYO carrier of negligently adjusting or handling a claim, or otherwise engaging in conduct that was outside the scope of the NFIP arrangement, the carrier would lose the broader benefits and protections of the Program, including the explicit limitation of liability contained in Article IX. In the Court's view, such a result would impede, rather than further the goals of the NFIP.

As discussed above, courts and Congress have deemed it inefficient to expose WYO carriers to extra-contractual liability arising from their administration of the Program, including, specifically, their claims handling activities.  See, e.g., Wright II, 500 F.3d at 397.  Indeed, the Program's subsidized reimbursement arrangement incentivizes private insurance companies to provide affordable flood loss coverage, and effectively sustains the existence of a national flood insurance industry, which otherwise might not be feasible.  See C.E.R., 386 F.3d at 270 (speculating that if FEMA refused to reimburse WYO carriers for their defense costs, "insurers would leave the Program, driving the price of insurance higher"); Moffett, 457 F. Supp. 2d at 586 (observing that if FEMA regularly declined to reimburse litigation costs, "WYO carriers might well leave the Program in droves"); cf. Jacobson, 672 F.3d at 174 (noting that "many factors have made it uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions").

In the Court's view, the "Loss Payments" regulation does not, as the Plaintiff contends, supplant Article IX's limitation of liability by removing from the Program's embrace any carrier who is alleged to have acted negligently or outside the scope of the NFIP arrangement.  Rather, consistent with the governmental interest in safeguarding the federal Treasury, see C.E.R., 386 F.3d at 271 (finding it relevant that "FEMA ordinarily will be responsible financially for the costs of defending a lawsuit against a WYO company") and  Wright II, 500 F.3d at 394 (emphasizing that successful extra-contractual claims "would likely be paid with government funds"), the "Loss Payments" regulation is simply meant to invest FEMA with the discretion to withhold or deprioritize the use of taxpayer dollars for certain categories of claims in administering the Program.

Instructive on this point is <u>Moffett</u>, <u>supra</u>, in which substantially the same argument, based on the same regulation, was made by the plaintiffs with respect to tort claims based on procurement and adjustment fraud under state law. In particular, similar to Melanson, the plaintiffs in that case argued that:

> "[I]f the accused activity [i.e., procurement fraud, adjustment fraud, and tortious interference] is outside the scope of the authorized arrangement between the accused party and FEMA, rather than under the policy, there [is] no express or field preemption of any kind." And in this case, say Plaintiffs, Defendants conspired "to act completely outside the scope of their authority under the NFIP" by carrying out an " 'in-place' comprehensive scheme" to deny them the benefits of their SFIPs, a conspiracy starting with FEMA at the top and running all the way down to the independent adjusters.

<u>See</u> <u>Moffett</u>, 457 F. Supp. 2d at 586.

The district court rejected this argument, noting that it is the sole province of FEMA and the Federal Insurance Administrator to determine what actions are significantly outside the scope of the NFIP arrangement and/or involve agent negligence. <u>See</u> <u>id.</u> at 586-87 ("The regulation leaves the definition of what is within and without the Arrangement to FEMA's General Counsel"). If, as the Plaintiff in this case contends, the "determination of what is 'significantly outside the scope of the Arrangement' or agent negligence were left to the pleader, FEMA would ostensibly be obliged to decline to reimburse any activity that the pleader might assert in a complaint was 'significantly outside the scope of the Arrangement' or that arguably amounted to agent negligence." <u>Id.</u> at 287. Indeed, the court in <u>Moffett</u> observed that, as in this case, "[e]very time an aggrieved insured might use these magic words, the WYO carrier would be left to twist in the wind. This would obviously not be in the best interest of the NFIP; WYO carriers might well leave the Program in droves." <u>Id.</u>

The Court finds the reasoning in <u>Moffett</u> to be persuasive. Although the Plaintiff in this case characterizes the Defendants' conduct in such a way as to cast it far outside the scope of the NFIP arrangement, <u>see, e.g.</u>, Pl. Opp., DE [62], at 9 ("If conspiring to defraud policyholders by forging engineering reports is not significantly outside the scope of the WYO carriers' fiscal agency, it is difficult to imagine what would be"), the Plaintiff has no authority to make such a determination. As noted by the court in <u>Moffett</u>, the regulation relied upon by the Plaintiff is triggered only after "the *FEMA OCC finds* that the litigation is grounded in actions by the Company that are significantly outside the scope of th[e] Arrangement." <u>Id.</u> at 586 (quoting 44 C.F.R., Part 62, App. A, Art. III(D)(3)(a)) (emphasis in original). And even then, it only operates to make the carrier responsible for bearing its own costs, not to expose it to unlimited liability.

In any event, in this case, there is no allegation that FEMA has made any such finding; that it has declined to defend this action; or that any other rational basis exists for treating this action as outside the scope of the relevant NFIP agreement. In the Court's view, this result is particularly warranted since the Plaintiff's factual allegations, assuming them to be true, relate clearly to a claims handling dispute, which under Article IX is redressable only through a contract claim. The Plaintiff's conclusory allegations of fraud and forgery do not require a different result.

Further, the Plaintiff's reliance on <u>Houck v. State Farm Fire and Casualty Co.</u>, 194 F. Supp. 2d 452 (D.S.C. 2002), which dealt primarily with allegations of procurement fraud, and not with any dispute arising from the adjustment and payment of a flood loss claim, does not alter the Court's reasoning.

Accordingly, the Court grants the motions to dismiss by US Forensic, Bell, Zeng, Standard Insurance, and National Flood Service to the extent that they seek to dismiss the Plaintiff's civil RICO claim as being preempted by the NFIP.  The Court's reasoning in this regard applies with equal force to each of the named Defendants in this action, and the Plaintiff's First Cause of Action is therefore dismissed in its entirety.  Having so held, the Court need not reach the Defendants' remaining contentions directed at the RICO claim.

Further, the Court denies the Plaintiff's request for leave to amend the complaint at this juncture, as it is procedurally improper.  See Garnett-Bishop v. N.Y. Cmty. Bancorp, Inc., No. 12-cv-2285, 2014 U.S. Dist. LEXIS 157806, at *13-*14 (E.D.N.Y. Nov 6, 2014) (Spatt, J.) ("[N]umerous courts have held that a bare request to amend a pleading contained in a brief, which does not also attach the proposed amended pleading, is improper under Fed. R. Civ. P. 15") (citing Curry v. Campbell, No. 06-cv-2841, 2012 U.S. Dist. LEXIS 40341, at *22 (E.D.N.Y. Mar. 23, 2012) ("To satisfy the requirement of particular[it]y in a motion to amend a pleading, the proposed amended pleading must accompany the motion so that both the Court and opposing parties can understand the exact changes sought"); Evans v. Pearson Enters., Inc., 434 F.3d 839, 853 (6th Cir. 2006) ("We agree with several of our sister circuits that a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought . . . —does not constitute a motion within the contemplation of Rule 15(a)")).  This ruling is made without prejudice to the Plaintiff's renewal of his request as a formal motion under Rule 15(a).

C.      **As to Whether the Plaintiff's Breach of Contract Claim is Time-Barred**

As noted above, Standard Insurance also seeks to dismiss the Plaintiff's Second Cause of Action, based on breach of contract, on the ground that it is time-barred.  In

particular, Standard Insurance relies upon the statute of limitations contained in the SFIP, which states, in relevant part, that an action to recover monetary damages under the Policy must be commenced "within one year after the date of the written denial of all or part of the claim." See 44 C.F.R., Part 61, App. A(1), Art. VII(R). In this regard, Standard Insurance further relies upon a December 6, 2013 letter, in which it advised Melanson that his claim for coverage under the Policy was partially denied. See Compl. Ex. "6." Thus, because this action was commenced on July 8, 2015, *i.e.*, more than one year after the carrier provided written notice of its denial of coverage, Standard Insurance argues that this matter is time-barred.

The Plaintiff failed to respond to this contention in his opposition to the motion to dismiss, and therefore, is deemed to have abandoned the breach of contract claim. See Thomas v. N.Y.C. Dep't of Educ., 938 F. Supp. 2d 334, 354 (E.D.N.Y. 2013); see also Gorfinkel v. Vayntrub, No. 13-cv-3093, 2014 U.S. Dist. LEXIS 116313, at *13 (E.D.N.Y. Aug. 20, 2014); Alzheimer's Disease Res. Ctr., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, 981 F. Supp. 2d 153, 163 (E.D.N.Y. 2013); Hardy v. City of New York, 732 F. Supp. 2d 112, 125-26 (E.D.N.Y. 2010); Blake v. Race, 487 F. Supp. 2d 187, 217 (E.D.N.Y. 2007).

In any event – and particularly in the absence of any argument to the contrary – the Court discerns no substantial basis for finding that this action is timely. The plain language of the SFIP establishes a one-year statute of limitations for policyholders to commence an action, running from the date on which the insured received a written denial of his claim. In this case, the evidence annexed to the Plaintiff's complaint indicates that he received notice of Standard Insurance's intention to partially disclaim coverage on December 6, 2013, but did not commence this action until July 8, 2015, more than one year later.

The Court notes that, in his complaint, the Plaintiff alleges that:

> After revelations of widespread fraud in the claims handling processes following Hurricane Sandy, FEMA waived its proof of loss requirement by reopening all Hurricane Sandy claims, including Plaintiff's. Beginning on or about May 18, 2015, FEMA sent letters to all 144,000 Sandy claimants, including Plaintiff, informing them of the claims reopen process and giving them the opportunity to submit additional evidence in proof of loss of their claim. FEMA is allowing claimants the opportunity to request an additional inspection by an adjuster or an engineer, if required. The NFIP's reopening of all Hurricane Sandy cases has at least extended the time for Plaintiff to present evidence of flood damage ignored or wrongfully denied by Standard Fire (and other WYO carriers) and claim additional Policy proceeds to which he is entitled. Accordingly, the deadline for Plaintiff to seek redress from the Court for Defendants' wrongful conduct has also been restarted, or at least extended.

Compl. ¶ 72.

The alleged correspondence referenced in this paragraph is not annexed to the complaint. However, the Court finds that this allegation, even if taken as true, is insufficient to justify tolling the statute of limitations.

A similar issue arose in the case of the <u>Wagner v. Director of FEMA</u>, 847 F.2d 515, 521 (9th Cir. 1988), where the court held that "[o]nce FEMA has triggered a statute of limitations by issuing a denial, reconsideration of that denial or responding to further inquiries about the case has no effect on the running of the limitations period. Only where the Federal Insurance Administrator expressly and in writing sets aside the previous disallowance of a plaintiff's claim does a new limitations period commence upon a subsequent denial of the claim." In this case, the Plaintiff does not allege that the Federal Insurance Administrator expressly and in writing set aside the initial denial of coverage by Standard Insurance. Nor does he allege that, upon submission of additional information, his renewed claim for flood loss coverage was denied a second time, thus commencing a new limitations period. Under these circumstances, the Court is of the view that the

present action was commenced beyond the expiration of the statutory limitations period, requiring dismissal.

Accordingly, the Court grants the motion to dismiss by Standard Insurance to the extent that it seeks to dismiss the Plaintiff's Second Cause of Action as time-barred.

### III.    Conclusion

Based on the foregoing, the Court grants the Defendants' motions to dismiss the Plaintiff's complaint in its entirety.

Further, the Plaintiff's request for leave to amend the complaint is denied without prejudice to renewal as a formal motion in accordance with Fed. R. Civ. P. 15, the Local Civil Rules of the Eastern District of New York, and this Court's Individual Rules of Practice.  Any such motion to amend shall be filed within 60 days of the date of this order.

It is **SO ORDERED**

Dated: Central Islip, New York
      April 30, 2016        */s/ Arthur D. Spatt*_____
                        ARTHUR D. SPATT
                        United States District Judge